* * * * * * * * * * *
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, modifies and affirms the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * * ORDER
Defendant Royal SunAlliance moved for admission into evidence a Form 22 wage chart for the first time at the time of filing of its brief to the Full Commission. The Full Commission by order entered December 20, 2005, gave Plaintiff fifteen days to stipulate to or object to the Form 22 wage chart. Plaintiff objected to admission of the document into evidence. The Full Commission in its discretion hereby reopens the record to allow Defendant Royal SunAlliance to present evidence on Plaintiff's average weekly wage.
The records of Med One, Robert G. Fletcher, M.D., which were admitted into evidence at hearing by stipulation of the parties are added to the record.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The Employee is Leroy King.
2. The Employer is Lundy Packing Company.
3. The carrier on the risk at the time of the alleged February 27, 1997 injury by accident and/or occupational disease to the left shoulder, neck and elbow, in Industrial Commission File No. 699871 was Kemper National Insurance Company. The carrier on the risk at the time of the alleged August 6, 1998 injury by accident and/or occupational disease of bilateral carpal tunnel syndrome and injury to the left foot and various other body parts, in Industrial Commission File No. 937503 was EBI [Royal 
SunAlliance] Company.
4. The Employer regularly employs three or more employees and is bound by the Workers' Compensation Act. An Employer-Employee relationship existed on February 27, 1997 and on August 6, 1998, the alleged dates of injury.
5. The average weekly wage is to be determined by a Form 22 to be submitted by Defendants pursuant to the Pretrial Order.
6. The parties stipulate to the consolidation of Industrial Commission File Nos. 699871 and 937503.
7. Plaintiff's claim is for reoccurrence/change of condition for the left elbow, neck and shoulder under Industrial Commission File No. 699871 as of August 6, 1998, and for bilateral carpal tunnel syndrome and for injury to his left shoulder and spine arising out of his repetitive duties in the scope and course of his employment.
8. Defendant Royal SunAlliance hereby accepts liability for the claim for bilateral carpal tunnel syndrome and scalding to the left foot.
9. Defendant Kemper Insurance Company has neither accepted nor denied Plaintiff's current claims as compensable; however, the Plaintiff's claim for left epicondylitis was accepted [by Kemper] via a Form 21 approved by the Industrial Commission on July 16, 1997.
 * * * * * * * * * * *
Based on the foregoing Stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of hearing before the Deputy Commissioner, Plaintiff was fifty-five years old and had worked for Defendant-Employer for approximately thirty years before his last day on August 6, 1998. In his employment with Defendant-Employer, Plaintiff worked on a production line, trimming and cutting pork products. Due to Plaintiff's height of six feet, eleven inches, the production line conveyor belt was below his knee level and he had to repeatedly crouch in order to perform his work duties.
2. Throughout the relevant times of employment for Plaintiff's claims, there was a change in status of the carrier on the risk. Kemper Insurance Company (hereinafter Kemper) was Defendant-Employer's carrier from December 31, 1996 through December 31, 1997 and EBI/Royal SunAlliance Company (hereinafter Royal SunAlliance) was Defendant-Employer's carrier from January 1, 1998 through Plaintiff's last date of employment on August 6, 1998.
3. On February 27, 1997, Plaintiff was lifting a neck bone from Defendant-Employer's production line conveyor belt when he felt a sharp pain in the left side of his neck, which traveled down his arm to his fingers. Kemper accepted liability for Plaintiff's condition of left epicondylitis on a Form 21 agreement and paid compensation for three-sevenths (3/7) weeks. Kemper also filed a Form 26 agreement for payment of compensation to Plaintiff for temporary partial disability at "various" rates after his return to work earning diminished wages.
4. After his February 27, 1997 injury, Plaintiff was initially seen by the plant physician, Dr. Robert Fletcher, who thereafter referred him to Dr. William de Araujo at Goldsboro Orthopaedic Associates. Dr. de Araujo diagnosed Plaintiff with left-sided cervical radiculopathy and lateral epicondylitis and gave him a steroid injection. He advised that Plaintiff could return to work in a light-duty capacity, lifting no more than ten pounds. Plaintiff missed some time from work as reflected on the Form 21 and 26 agreements, but did return to work and was earning pre-injury wages by the end of April 1997; however, he was restricted to modified work with lifting restrictions of fifteen pounds with the left arm and continued to receive injections. Plaintiff continued to treat with Dr. de Araujo throughout 1997. On November 7, 1997 Dr. de Araujo assessed Plaintiff with resolved lateral epicondylitis and impingement syndrome of the left shoulder and did not assign an impairment rating based on Plaintiff's complete return to normal function. Plaintiff thereafter continued to work for Defendant-Employer in a full-duty capacity earning his pre-injury wages.
5. On January 6, 1998, plant physician, Dr. Fletcher, again saw Plaintiff. The medical notes from the visit indicate that Plaintiff presented to Dr. Fletcher with complaints of pain over the medial epicondyle and numbness into the ring and little finger, pain in the shoulder and also some neck and headache pain. Dr. Fletcher characterized several of these complaints as "new." Dr. Fletcher indicated that due to Plaintiff's extreme height, the job position in which he worked was aggravating his condition. Plaintiff was not taken out of work.
6. On July 30, 1998, Plaintiff was working on the production line when a co-worker accidentally dropped a neck bone into a container of sterilizer water heated to a temperature of one hundred and eighty degrees. The sterilizer water splashed onto Plaintiff and burned his left foot. Royal SunAlliance was the carrier on the risk at the time of this injury.
7. On August 6, 1998, Plaintiff was evaluated by Dr. Eddie Powell who took him out of work due to the burn on the left foot, which developed into cellulitis. Based on Plaintiff's complaints, Dr. Powell also recommended that various other conditions, including a herniated disk with radiculopathy of the right arm be ruled out.
8. Plaintiff worked his last day with Defendant-Employer on August 6, 1998. Although Plaintiff tried to return to work after his foot injury, his left foot was too painful to stand on and work. Plaintiff testified that his burn was slow to heal and that he periodically returned to the plant for the plant nurse to examine him. He also testified that it was December 1998, before he could even wear a shoe on the left foot. Royal SunAlliance admitted liability for Plaintiff's foot injury for the first time in their Pre-Trial Agreement stipulations dated December 17, 2002.
9. On August 25, 1998, Defendant-Employer's on-site occupational health nurse, S. Spelling, inspected Plaintiff's left foot and noted that the top area where Plaintiff's foot was burned had healed well and only a small area of pink tissue remained. No edema, drainage or redness was noted. Nurse Spelling's medical notes indicate that Plaintiff was placed on Family Medical Leave of Absence effective August 6, 1998, due to the scalding injury to the left foot.
10. Plaintiff was experiencing pain and numbness in his hands and wrists when he left work on August 6, 1998. He testified, "I couldn't grip nothing. The pain was — be, like, right here in my wrist. I'd start moving it, and the pain would be so severe, I couldn't hardly — I didn't have no grip or nothing so — and I still don't have grip." On November 13, 1998, Dr. Fletcher noted that Plaintiff was totally disabled from his previous work with Defendant-Employer on a permanent basis.
11. On August 23, 1999, Dr. James E. Lowe, Jr. of Plastic Reconstructive and Hand Surgery initially saw Plaintiff on referral from Dr. Powell for evaluation and treatment of Plaintiff's hands, wrists, and some non-work related nodules that required surgical removal. On November 9, 1999, Dr. Lowe examined Plaintiff for pain and numbness in both of his upper extremities, and numbness and tingling in his fingers on both hands at night. Dr. Lowe scheduled Plaintiff for an EMG nerve conduction study, which was conducted by Dr. Arnell Patel on November 9, 1999. The nerve conduction study yielded abnormal results, and Plaintiff was diagnosed with bilateral carpal tunnel syndrome. On December 1, 1999, Dr. Lowe performed a left carpal tunnel release on Plaintiff, and on February 9, 2000, he performed a right carpal tunnel release. Royal SunAlliance admitted liability for Plaintiff's bilateral carpal tunnel syndrome in the Pre-Trial Agreement stipulations.
12. Plaintiff testified that following surgery, he still had no grip and his hands and wrists hurt all the time. When asked at hearing whether he could go back to his work with Defendant-Employer considering the condition of his hands and wrists, Plaintiff replied, "you've got to have grip in your hand to hold that meat and stuff. I ain't got no grip in my hand, and if I grip anything, my wrist and stuff start aching." When asked whether he could return to his past work on the meat packing production line work with the limitations due to his foot injury he replied, "[n]o because I can't stand, right now sometimes I can't hardly stand to put pressure on it myself. It swells and it hurts." Plaintiff explained that he could probably stand in one spot about five or ten minutes.
13. Dr. Lowe opined and the Full Commission finds that Plaintiff developed bilateral carpal tunnel syndrome and synovitis due to his work place duties and that these duties placed him at a greater risk than the general public for developing these conditions. Dr. Lowe explained that flexion and extension of the wrist increases the pressures within the carpal canal and those increased pressures cause ischemia and pressure on the median nerve. He further testified that there are several factors involved, including pressure, mechanics of the movement, and the constant movement.
14. Dr. Lowe testified that Plaintiff's ongoing symptoms related to carpal tunnel syndrome include numbness and weakness, longstanding serious nerve problems, as well as weak pinch and grip strength bilaterally. He was of the opinion that most of the symptoms Plaintiff has with his hands come from his bilateral carpal tunnel syndrome. He stated:
 He does have problems with a bulging disk in this neck that was documented by an MRI. . . . He had multiple epidurals which negate the effects of a herniated disk in the neck. So I think it's safe to say that most of his complaints in his hands now are due to local disease at his wrist level, residual effects of carpal tunnel, as well as scar tissue that has probably formed as a result of surgery that he's had, and he has synovitis. . . . And I think that in [P]laintiff's case because of the synovitis and his ongoing carpal tunnel that his pressures are elevated in the carpal tunnel.
15. Dr. Lowe removed Plaintiff from his work with Defendant-Employer permanently. When asked whether Plaintiff was disabled from his past work with Defendant-Employer due to the carpal tunnel syndrome and the treatment provided for the bilateral carpal tunnel syndrome, Dr. Lowe stated that Plaintiff would definitely be disabled from doing that type of work.
16. Although Dr. Lowe did not treat Plaintiff until August 1999, he was able to opine to a reasonable degree of medical certainty that based on the severity of his carpal tunnel syndrome in 1999, Plaintiff more likely than not had carpal tunnel syndrome in 1998 when he left work. Dr. Lowe testified that when he operated on Plaintiff, his median nerve was severely fibrotic. He testified:
 It was flat and there was essentially a neuroma formation, which means that he had to have had the pressure for at least 12-18 months, — that that degree of compression does not occur in a few months, this was a longstanding problem. So it is my opinion that all those factors did contribute to that and to his median nerve compression and that he more than likely had it in 1998.
17. Dr. Lowe was of the opinion that Plaintiff's residual impairments from the bilateral carpal tunnel syndrome were permanent and he expected Plaintiff to experience permanent ongoing residual weakness of both hands. He expected Plaintiff's hands to tire rapidly and become weak and numb with any activity.
18. Dr. Lowe also opined that Plaintiff will need ongoing medical treatment to manage the residual problems from his carpal tunnel syndrome and he may need repeat surgery on the carpal tunnel to address adhesions and synovitis. Dr. Lowe opined to a reasonable degree of medical certainty that based on all his examinations, Plaintiff's history, and his treatments consisting of approximately sixty-five visits, "the residual problems from his carpal tunnel syndrome are the main factors or the main dysfunction that's keeping him from returning to his past work or any other work." The Full Commission gives greater weight to the opinions of Dr. Lowe and finds that as a result primarily of Plaintiff's bilateral carpal tunnel syndrome and related residual problems, he is physically incapable of returning to work with Defendant-Employer or to any other employment.
19. Dr. Lowe also opined that the conditions of Plaintiff's work aggravated his cubital tunnel syndrome.
20. Dr. George Huffmon, a neurosurgeon, examined Plaintiff on October 14, 2002 and December 19, 2002. At the October 14, 2002 examination, Plaintiff complained of low back pain, hip pain, neck pain and pain radiating into his left shoulder. Plaintiff reported that he was injured at work in 1997.
21. Dr. Huffmon found that Plaintiff had pain in his neck, but no weakness in his upper extremities. Dr. Huffmon referred Plaintiff to Dr. Anne Peacock Bettendorf for an EMG nerve conduction study.
22. Dr. Bettendorf was asked to evaluate Plaintiff's ongoing complaints to determine whether he had "left cervical radiculopathy vs brachial plexopathy vs carpal tunnel syndrome." She concluded that Plaintiff's symptoms were caused by significant left cervical radiculopathy. Although Dr. Bettendorf noted Plaintiff's history of carpal tunnel syndrome, she concluded that his EMG study was consistent with successful surgical release of the carpal ligament.
23. Dr. Huffmon concurred with Dr. Bettendorf's assessment and testified that the EMG was consistent with acute nerve root injury in his left neck. Dr. Huffmon further noted that Plaintiff had problems with cervical radiculopathy and that the findings from Plaintiff's cervical MRI and myelogram were consistent with severe degenerative changes.
24. Dr. Huffmon opined that the February 27, 1997 incident where Plaintiff was pulling a neck bone off the line and felt pain in his neck and left shoulder with radiation into his arm, gradually increased in severity and aggravated Plaintiff's degenerative condition. He also opined that the February 27, 1997 incident was the "big" event, but as he continued to work full time for Defendant-Employer, Plaintiff's job duties aggravated his cervical and shoulder condition. The Full Commission gives greater weight to the opinions of Dr. Lowe over any contrary opinions of Dr. Huffmon and Dr. Bettendorf.
25. Mr. Bob Manning, a certified rehabilitation counselor, performed a labor market assessment to determine whether he could identify other reasonable, suitable job opportunities for Plaintiff. Mr. Manning opined that based solely on the prescribed limitations assigned by Dr. Lowe, he did not think there were any reasonable, suitable job opportunities for Plaintiff. The Full Commission accepts Mr. Manning as an expert in rehabilitation counseling based on his knowledge and experience and gives great weight to his opinion on Plaintiff's employability.
26. Plaintiff sustained a compensable injury by accident to his left elbow, neck and shoulder on February 27, 1997, which was diagnosed as lateral epicondylitis and shoulder impingement syndrome, while Kemper was the carrier on the risk. Plaintiff's symptoms related to his lateral epicondylitis and impingement syndrome caused by his February 27, 1997, injury resolved by November 7, 1997, when Dr de Araujo determined that he had completely returned to normal function and was capable of working full duty, without restrictions. Plaintiff's job duties aggravated his cervical and shoulder condition and his degenerative disk disease prior to and after February 27, 1997. Dr. Fletcher treated Plaintiff for cervical radiculopathy and left lateral epicondylitis in 1996. Plaintiff continued to complain of radicular pain in his neck and arm up to the time he left work on August 6, 1998. Kemper is not responsible for payment for medical treatment Plaintiff received after November 7, 1997. Plaintiff has not proven that he sustained a change of condition for the left elbow, neck and shoulder injury of February 27, 1997.
27. The greater weight of the evidence establishes that Plaintiff has not returned to work in any capacity since August 6, 1998, when he left work after his injury to his foot. Plaintiff's disability related to his foot has ended, but he continues to be totally disabled as a result of his bilateral carpal tunnel syndrome and related conditions. Royal 
SunAlliance is the responsible carrier for these conditions.
28. The medical treatment Plaintiff received as a result of his injuries and occupational diseases was reasonably required to effect a cure, provide relief and lessen his disability.
29. No evidence was timely submitted concerning Employee-Plaintiff's average weekly wage. Defendant Royal 
SunAlliance agreed pursuant to the Pre-Trial Agreement to provide a Form 22, and they are responsible for providing the Form 22. Defendant Royal SunAlliance failed to comply with the Deputy Commissioner's order to submit a Form 22 wage chart before the record closed. Defendant Royal SunAlliance did not submit a Form 22 wage chart until it filed its brief to the Full Commission. Plaintiff objected to the admission of this document into evidence. The record herein is reopened to allow Defendants to present evidence of Plaintiff's average weekly wage. Plaintiff's compensation, however, should not be delayed while the average weekly wage issue is being resolved.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an admittedly compensable injury by accident to his left elbow, neck and left shoulder on February 27, 1997, arising out of and in the course of employment while Kemper was the carrier on the risk. Plaintiff's conditions resolved by November 7, 1997, when Plaintiff was released to return to full-duty work, without restrictions and his treating physician did not assign him any impairment rating. Kemper has paid Plaintiff all compensation due arising from this injury. Kemper is not liable for any medical treatment or disability compensation Plaintiff may be due after November 7, 1997. N.C. Gen. Stat. §§ 97-25; 97-2(6); 97-29.
2. To prove a compensable occupational disease pursuant to N.C. Gen. Stat. § 97-53(13), Plaintiff must establish that his condition meets three criteria: (a) the condition is "characteristic of persons engaged in the particular trade or occupation in which the [Plaintiff] is engaged," (b) the condition is "not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation," and (c) there is a "causal connection between the disease and the [Plaintiff's] employment" in that the employment significantly contributed to or was a significant causal factor in the disease's development. Rutledgev. Tultex Corp., 308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983). The first two requirements of this test are met if Plaintiff can show that the employment created an increased risk for contracting the particular disease than the general public. Id.
at 94, 301 S.E.2d at 365. Based upon the greater weight of the evidence, Plaintiff developed bilateral carpal tunnel syndrome and synovitis while working for Defendant-Employer, and Plaintiff's job duties placed him at a greater risk than the general public for developing bilateral carpal tunnel syndrome and synovitis. Plaintiff contracted bilateral carpal tunnel syndrome and synovitis during a period of time when Royal 
SunAlliance was on the risk. Royal SunAlliance admits liability for Plaintiff's bilateral carpal tunnel syndrome.
3. Plaintiff's job duties with Defendant-Employer aggravated his cubital tunnel syndrome and placed him at an increased risk for aggravation of this condition.
4. On July 30, 1998, Plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of his employment with the Defendant-Employer when he suffered a left foot burn. As a result of his foot injury, Plaintiff was disabled for a short period of time; however, this period of disability ran concurrently with his disability related to his bilateral carpal tunnel syndrome. Royal SunAlliance was the carrier on the risk at the time of said injury by accident. N.C. Gen. Stat. § 97-2(6).
5. As a result primarily of his bilateral carpal tunnel syndrome, but also his related synovitis and cubital tunnel syndrome, Plaintiff has been totally disabled since August 6, 1998, his last day of work for Defendant-Employer. Royal 
SunAlliance is responsible for the workers' compensation benefits to which the Plaintiff is entitled as a result of these conditions. N.C. Gen. Stat. § 97-29.
6. The evidence does not establish a change in condition relating to Plaintiff's February 27, 1997 injury, as Plaintiff's disability is caused primarily by his bilateral carpal tunnel syndrome, synovitis and related residual conditions. Plaintiff's job duties did continue to aggravate his pre-existing cervical radiculopathy and lateral epicondylitis until his last day of work on August 6, 1998, but these conditions were not disabling. N.C. Gen. Stat. § 97-47.
7. "The burden is on the employee to show that he is unable to earn the same wages he earned before the injury, either in the same employment or in other employment. The employee may meet this burden in one of four ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury." Russell v.Lowes Product Distribution, 108 N.C. App. 762, 765,425 S.E.2d 454, 457 (1993). Here, Plaintiff has established by the greater weight of the evidence through the opinion testimony of Dr. Lowe that the residual problems to both of his hands from work-related bilateral carpal tunnel syndrome are the main factors or the main dysfunction that keeps Plaintiff from returning to his past work or any other work and that he is physically, as a consequence of these work related injuries or conditions, incapable of work in any employment. In addition, Plaintiff presented the testimony of Mr. Manning, which establishes that based on the prescribed limitations assigned by Dr. Lowe, he did not think there were any reasonable, suitable job opportunities for Plaintiff. Also, the Full Commission finds credible Plaintiff's own opinion based on thirty years of employment with Defendant-Employment that he cannot return to work because he cannot grip anything with either hand, he can only stand for about ten minutes, and he has continuing pain in his wrists.
8. No evidence was timely submitted concerning Employee-Plaintiff's average weekly wage. Defendant Royal 
SunAlliance agreed pursuant to the Pre-Trial Agreement to provide a Form 22, and they are responsible for providing the Form 22. Defendant Royal SunAlliance failed to comply with the Deputy Commissioner's order to submit a Form 22 wage chart before the record closed. Defendant Royal SunAlliance did not submit a Form 22 wage chart until it filed its brief to the Full Commission. Plaintiff objected to the admission of this document into evidence. The record herein is reopened to allow Defendants to present evidence of Plaintiff's average weekly wage. Plaintiff's compensation, however, should not be delayed while the average weekly wage issue is being resolved. Since Defendant Royal SunAlliance does not dispute that Plaintiff's average weekly wage should be calculated based upon the Form 22 wage chart it has now submitted, the Full Commission finds that Plaintiff should be paid compensation based upon an average weekly wage of $505.75 and a compensation rate of $337.19 until competent evidence is presented on Plaintiff's average weekly wage.
9. As a result of his compensable occupational diseases, Plaintiff is totally disabled from working in any employment and is entitled to total disability compensation to be paid by Royal SunAlliance from August 6, 1998, through the date of the hearing before the Deputy Commissioner and continuing at the interim rate of $337.19 per week until further order of the Commission. N.C. Gen. Stat. § 97-29.
10. Plaintiff is entitled to have Royal SunAlliance pay all medical expenses related to his compensable occupational diseases and foot injury beginning July 30, 1998, and continuing for so long as such treatment is necessary to effect a cure, provide relief and/or lessen his period of disability. N.C. Gen. Stat. §§97-2(19); 97-25.
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Royal SunAlliance shall pay to Plaintiff temporary total disability compensation from August 6, 1998, through the date of the hearing before the Deputy Commissioner and continuing at the interim rate of $337.19 per week until further order of the Industrial Commission.
2. Royal SunAlliance shall pay all of Plaintiff's medical expenses related to his compensable occupational diseases and left foot injury, for so long as such treatment is necessary to effect a cure, provide relief and/or lessen his period of disability, when bills for such treatment have been approved according to Industrial Commission procedure.
3. Kemper has paid all indemnity compensation to which Plaintiff is entitled due to the February 27, 1997 injury. Kemper shall pay to Plaintiff any unpaid medical expenses related to his lateral epicondylitis, cervical radiculopathy and shoulder impingement during the period from February 27, 1997 through November 7, 1997, when bills for the same have been approved according to Industrial Commission procedure.
4. Twenty-five percent of the compensation awarded Plaintiff herein is approved as a fee for Plaintiff's attorney and shall be deducted and paid directly to Plaintiff's attorney as follows: (a) twenty-five percent of Plaintiff's accrued compensation shall be deducted and paid directly to Plaintiff's attorney, and (b) thereafter, every fourth check from the compensation due Plaintiff shall be deducted and paid directly to Plaintiff's attorney.
5. The record is hereby reopened for receipt of additional evidence on Plaintiff's average weekly wage by stipulation or deposition testimony.
6. Defendant Royal SunAlliance shall bear the costs.
This the __ day of February 2006.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN